STATE of Wisconsin, Plaintiff-Respondent,

v.

Kathleen A. ULTSCH, Defendant-Appellant.

Court of Appeals

*No. 2010AP895–CR. Submitted on briefs October 8, 2010.
—Decided December 23, 2010.*

2011 WI App 17

(Also reported in 793 N.W.2d 505.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Shelley M. Fite,* assistant state public defender of Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Thomas J. Balistreri,* assistant attorney general, and *J.B. Van Hollen,* attorney general.

Before Lundsten, Higginbotham and Sherman, JJ.

¶ 1. SHERMAN, J. Kathleen A. Ultsch appeals from a judgment of conviction for operating while intoxicated (OWI), fifth offense, contrary to Wis. Stat. § 346.63(1)(a).[1] Ultsch argues the circuit court erred in denying her motion to suppress evidence obtained when police officers entered her house without a warrant and subsequently detained her and placed her under arrest. The circuit court denied the motion, concluding that the warrantless entry into the house was justified under the community caretaker exception to the general rule that warrantless searches and seizures violate

---

[1] All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

245

the Fourth Amendment to the United States Constitution. We disagree and thus reverse the circuit court's denial of Ultsch's motion to suppress and remand for further proceedings.

## BACKGROUND

¶ 2. In the early morning of January 1, 2008, Marquette County Deputy Sheriff Jeffrey J. Tomlin was dispatched to the scene of a motor vehicle collision involving a Dodge Durango and a brick building. The brick wall of the building was caved in at the doorway. The damage to the building was substantial enough that the occupant of the building was concerned about the structural integrity of the building. The vehicle had left the scene of the accident and was found at the beginning of a one-quarter mile long driveway of a private residence located two to three miles away. Tomlin observed damage to the vehicle's front left fender.

¶ 3. The driveway where the SUV was found was covered in "deep snow" and Ultsch had walked up the one-quarter mile long driveway, leaving the Dodge Durango at the foot of the driveway partially in the roadway. Police cars could not negotiate the driveway under those conditions. While the officers were at the bottom of the driveway, a vehicle came down the driveway from the home driven by an individual who identified himself as the owner of the home. The individual indicated that the driver of the damaged vehicle was his girlfriend and that she was up at the house "possibly in bed or asleep," but he declined to identify who she was. After the boyfriend left, a detective in a four-wheel-drive vehicle arrived and Tomlin and other officers drove up to the house. Tomlin did not see any blood in the snow as they drove up the one-quarter mile long driveway.

¶ 4. According to Tomlin, when the officers got up to the house, he "[k]nocked on the door and announced that [he] was from the Sheriff's Department." When there was no answer at the door, Tomlin "tried the knob" and discovered that the door was unlocked. Tomlin entered the house and made his way to the bedroom in the far rear of the house, where he found Ultsch in bed asleep.

¶ 5. Tomlin woke Ultsch and questioned her. Tomlin then transported Ultsch to the Sheriff's Department where he had Ultsch perform field sobriety tests and had her submit to a chemical test of her breath. Ultsch was subsequently placed under arrest.

¶ 6. Ultsch moved the circuit court to "suppress all evidence obtained as a result of the illegal entry, detention, and arrest." The Court denied the motion, ruling that the "entry into the house and seizure of [Ultsch were] justified pursuant to the deputy's community caretaker duties."

¶ 7. The State later amended the criminal complaint to allege felony fifth offense OWI, replacing the originally charged misdemeanor fourth offense. Thereafter a preliminary examination was held, after which Ultsch moved the circuit court for reconsideration of its denial of her motion to suppress. The court denied her motion, ruling: "I think that it was a caretaker function and it was properly exercised as his paramount concern."

¶ 8. Following the denial of her motion for reconsideration, Ultsch pled no contest to operating a motor vehicle while under the influence of an intoxicant, fifth or subsequent offense. Ultsch appeals. Additional facts will be set forth in our discussion below as necessary.

## DISCUSSION

### A. *Standard of Review*

██

¶ 9. The standard of review for searches and seizures based on the "community caretaker function" is:

> Whether police conduct constitutes a violation of the Fourth Amendment or Article I, Section 11 of the federal and state Constitutions is a question of constitutional fact that we review independently. Accordingly, we independently review whether an officer's community caretaker function satisfies the requirements of the Fourth Amendment and Article I, Section 11 of the federal and state Constitutions.

*State.v. Kramer*, 2009 WI 14, ¶ 16, 315 Wis. 2d 414, 759 N.W.2d 598 (internal citations omitted).

### B. *Community Caretaker Function Exercised in Residence*

██

¶ 10. "Subject to a few well-delineated exceptions, warrantless searches are deemed per se unreasonable under the Fourth Amendment," and Article I, Section 11 of the Wisconsin Constitution. *State v. Faust*, 2004 WI 99, ¶ 11, 274 Wis. 2d 183, 682 N.W.2d 371.[2] One of those exceptions may arise when a police officer is serving as a community caretaker to protect persons or

---

[2] The United States Supreme Court has stated that "[i]t is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980).

property.[3] *State v. Pinkard*, 2010 WI 81, ¶ 14, 327 Wis. 2d 346, 785 N.W.2d 592.

¶ 11. In *Cady v. Dombrowski*, 413 U.S. 433 (1973), and subsequently in *South Dakota v. Opperman*, 428 U.S. 364 (1976), the United States Supreme Court upheld warrantless searches of automobiles. In both cases, the court "relied on the diminished expectation of privacy in automobiles as part of its rationale for permitting the officers' search to secure the car's contents."[4] *Pinkard*, 327 Wis. 2d 346, ¶ 17.

¶ 12. In *Pinkard*, the Wisconsin Supreme Court held that "under certain circumstances a reasonably exercised community caretaker function may permit a warrantless entry into a home." *Id.*, ¶ 28. The court observed, however, that " 'for the purposes of the Fourth Amendment there is a constitutional difference between houses and cars,' . . . a warrantless search of a car deemed reasonable may be unreasonable in the context of a search of a home." *Id.*, ¶ 16 (quoted source omitted). Calling the warrantless entry into a residence "more suspect" than the search or seizure of a car under the community caretaker function, the court explained:

> Whether a given community caretaker function will pass muster under the Fourth Amendment so as to permit a warrantless home entry depends on whether

---

[3] "Although a multitude of activities fall within the community caretaker *function,* not every intrusion that results from the exercise of a community caretaker function will fall within the community caretaker *exception* to permit a warrantless entry into a home." *State v. Pinkard*, 2010 WI 81, ¶ 20, 327 Wis. 2d 346, 785 N.W.2d 592.

[4] The Wisconsin Supreme Court has also applied the community caretaker doctrine to the warrantless roadside seizure of an automobile. *See State v. Kramer,* 2009 WI 14, ¶ 1, 315 Wis. 2d 414, 759 N.W.2d 598.

the community caretaker function was reasonably exercised under the totality of the circumstances of the incident under review.

*Id.,* ¶ 20

██

¶ 13. To determine whether an officer's conduct properly falls within the scope of the community caretaker exception to the Fourth Amendment's warrant requirement based on home entry, we must determine:

(1) whether a search or seizure within the meaning of the Fourth Amendment has occurred; (2) if so, whether the police were exercising a bona fide community caretaker function; and (3) if so, whether the public interest outweighs the intrusion upon the privacy of the individual such that the community caretaker function was reasonably exercised within the context of a home.

*Id.,* 29.

## C. Application of the Three-Step Test

### i. Search

¶ 14. The Wisconsin Supreme Court has recently held that a warrantless unconsented entry into a residence is a search for purposes of the Fourth Amendment and satisfies the first element of the community caretaker analysis. *Id.,* ¶ 30. As in *Pinkard,* the warrantless unconsented entry into Ultsch's residence satisfies this test.

### ii. Bona Fide Community Caretaker

██ ██

¶ 15. Wisconsin courts "carefully examine[] the expressed concern for which the community caretaker function was undertaken to determine if it was bona

fide." *Id.*, ¶ 26. The question is whether there is an "objectively reasonable basis" to believe there is "a member of the public who is in need of assistance." *Kramer*, 315 Wis. 2d 414, ¶¶ 30, 32. In this case, the expressed concern was for Ultsch's "well-being" following the accident. Therefore, the question here is whether the police had an objectively reasonable belief that the driver of the Dodge Durango was in the home and in need of assistance.

¶ 16. In *Pinkard*, the supreme court found that this second test was met when police entered a residence acting on an anonymous tip that two people "appeared to be sleeping" in a room with cocaine, money and a digital scale while the door to the residence stood wide open. *Pinkard*, 327 Wis. 2d 346, ¶ 2.

¶ 17. The facts in this case are substantially different than those in *Pinkard*. In *Pinkard*, the vulnerability of the occupants of the residence was arguably more obvious. The supreme court reasoned that, with the door open and the occupants unresponsive, the occupants could easily have been victims of a crime or suffering from an overdose. *Id.*, ¶ 37. In either of those situations, time might be essential in avoiding loss of life.

¶ 18. The supreme court characterized the circumstances in *Pinkard* as a "close case." *Id.*, ¶ 33. In the present case, the police had less reason to be concerned. Had the officers found Ultsch sitting or sleeping in the parked vehicle, the circumstances arguably could have given rise to the caretaker function. *See Kramer*, 315 Wis. 2d 414, ¶ 4. However, warrantless entry into a residence is subjected to stricter scrutiny. *See Pinkard*, 327 Wis. 2d 346, ¶ 20.

██

¶ 19. When Tomlin arrived at Ultsch's parked Dodge Durango, the condition of the vehicle, viewed alone, was not such as to give rise to concern for Ultsch's safety. The damage, though significant, was limited to the vehicle's left front fender. The airbags had not deployed, the windshield was intact, there was no damage to the passenger compartment or to the driver's side door, and there was no blood or other indication of injury.

¶ 20. In addition, no person had given officers information that would indicate that Ultsch was in a vulnerable situation, nor did they observe anything that would indicate she was injured. When officers encountered the man who owned the residence where Ultsch lived, he told them that Ultsch was possibly asleep.[5] The officers did not ask the man about Ultsch's condition and "[h]e didn't mention her needing any assistance."

¶ 21. When the officers traveled up the one-quarter mile long driveway that Ultsch had apparently walked up a short time before, they did not notice any blood in the snow nor did anyone testify to any other indication that the driver needed assistance. In fact, except for the fact that she had been involved in a collision some time before—a collision which had only damaged the left front fender of her large, heavy SUV—the officers had no indication whatsoever that Ultsch might need assistance.

---

[5] In *Pinkard*, the callers indicated that the condition of the persons might be something less benign than merely sleep, stating that they "appeared to be sleeping." *Pinkard*, 327 Wis. 2d 346, ¶ 2.

¶ 22. We conclude, therefore, that there was not an "objectively reasonable basis" to believe that Ultsch was in need of assistance. *See Kramer*, 315 Wis. 2d 414, ¶ 30.

### iii. Public Interest Versus Intrusion Upon Privacy

¶ 23. Even if we determined that the police were exercising a bona fide community caretaker function when they entered Ultsch's residence, the entry would not fall within the community caretaker exception to the Fourth Amendment. It fails under the third and final inquiry, "whether the public interest outweighs the intrusion upon the privacy of the individual such that the community caretaker function was reasonably exercised within the context of a home." *Pinkard*, 327 Wis. 2d 346, ¶ 29.

█

¶ 24. To satisfy the third inquiry, the officer's exercise of the bona fide community caretaker function must have been reasonable. *Id.*, ¶ 41.

> To make this determination, we balance the public interest or need that is furthered by the officers' conduct against the degree and nature of the intrusion on the citizen's constitutional interest. "The stronger the public need and the more minimal the intrusion upon an individual's liberty, the more likely the police conduct will be held to be reasonable."

*Id.* (quoted source omitted).

█

¶ 25. We consider four factors in our consideration. *Id.*, ¶ 42. The first factor is the extent of the public's interest. *Id.* In the current case, in addition to the facts discussed above, Ultsch drove two miles in a

snowstorm and walked one-quarter mile up the driveway. Her boyfriend expressed no concern for her condition. There was good reason to believe she was intoxicated and almost no reason to think that she was in distress. Compared with the wide open door and vulnerability of the occupants in *Pinkard*, there is very little indication of any danger to Ultsch.

¶ 26. The second factor is the attendant circumstances surrounding the search. *Id.* These include the time, location, and the degree of overt force and authority displayed. *Id.* In the present case the door was unlocked and no force was displayed, but the degree of overt authority displayed was considerable. Ultsch was at home, asleep in her bedroom at 9:00 a.m. and Tomlin entered her bedroom and awakened her.

¶ 27. The third factor is whether the search or seizure took place in an automobile. *Id.* This factor does not apply because the search in this case took place in a residence.

¶ 28. The final factor evaluates the alternatives that were available to the action taken. *Id.* The primary alternative available to the officers in this case was to rely on the representation of Ultsch's boyfriend that Ultsch was sleeping in the light of the limited damage to the vehicle, the absence of evidence of injury to the driver, and the exigent circumstances discussed above, and do nothing.

¶ 29. Having reviewed each of the four factors, we conclude that in this case the public's interest in the intrusion was minimal, at best, and did not outweigh the substantial intrusion on Ultsch's privacy.

## CONCLUSION

¶ 30. For the foregoing reasons, we conclude that, under the totality of the circumstances, the State has

not established that the warrantless entry into Ultsch's residence satisfied the community caretaker exception and, therefore, we reverse the decision of the circuit court denying Ultsch's motion to suppress evidence and remand to the circuit court for further proceedings.[6]

*By the Court.*—Judgment reversed and cause remanded.

---

[6] The parties did not brief and we do not address the precise consequences of reversing the circuit court's suppression decision. We note that when police illegally enter and illegally arrest a defendant in a home, the exclusionary rule does not necessarily bar evidence later obtained away from the home. *See New York v. Harris*, 495 U.S. 14, 20–21 (1990).